**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No. 1:23-cv-22060-FAM

| | |
|---|---|
| BTC Media, LLC, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| The Trade Group, Inc., | ) |
| | ) |
| *Defendant*. | ) |

## AMENDED COMPLAINT

Plaintiff BTC Media, LLC ("BTC") files its amended complaint against Defendant Trade Group, Inc. ("TTG") under Federal Rule of Civil Procedure 15(a)(1)(A).

## PARTIES

1. Plaintiff BTC is a limited liability company organized under Delaware law. BTC's individual members are David Bailey (citizen of Puerto Rico), Calli Bailey (citizen of Tennessee), and Tyler Evans (citizen of Tennessee).

2. Defendant TTG is a corporation organized under Texas law whose principal place of business is in Grapevine, Texas. TTG is therefore a citizen of Texas. TTG may be served via its registered agent, Capitol Corporate Services, Inc., at 515 East Park Avenue, Second Floor, Tallahassee, Florida 32301.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties. Moreover, this case involves legal and equitable relief concerning a multimillion-dollar contract and a debt TTG is claiming it

is owed of roughly $5 million. Thus, the amount in controversy is in excess of this Court's jurisdictional minimum of $75,000.

4. TTG is subject to personal jurisdiction in this Court. This case arises out of work TTG performed for BTC related to the Bitcoin 2022 conference in Miami. TTG performed the contract at issue in this lawsuit in Florida by acquiring and organizing labor and materials for the conference. In connection with its performance under the contract, TTG sent numerous emails and phone calls to Florida and had its personnel travel to Florida on multiple occasions for purposes of performing the contract, including sending 30 of its employees to Miami to help prepare in the days leading up to the Miami conference. Further, TTG is registered to do business and maintains an agent for services of process in Florida. BTC's claims arise out of or relate to TTG's Florida contacts, including change orders TTG submitted to BTC immediately before or during the Bitcoin 2022 conference in Miami for deliverables provided in Miami. These Miami change orders constitute the bulk of the charges in dispute. Moreover, the invoices TTG submitted to BTC on the Miami change orders contain material misrepresentations of TTG's actual costs. Finally, TTG made material misrepresentations about its billing practices to BTC during an in-person meeting in Miami. Those misrepresentations give rise to BTC's fraudulent inducement claim.

5. Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to BTC's claims occurred in this District.

**FACTS COMMON TO ALL COUNTS**

6. BTC is in the business of promoting Bitcoin cryptocurrency and educating people on blockchain technology through digital media, merchandise, conferences, and other means.

7. BTC holds a large annual conference with speakers, an expo hall, networking events, and other trade-show type activities designed to connect people in the blockchain industry and showcase Bitcoin technology and how it can be used effectively by individuals and businesses.

8. TTG is a business that specializes in designing and creating exhibits and graphics for trade shows.

9. BTC hired TTG to be its general service contractor for BTC's Bitcoin 2022 conference in Miami.

10. As general service contractor, TTG was responsible for organizing labor and materials necessary for the conference including exhibits, décor, signage, event security, entertainment and recreation, and refreshments.

11. TTG hired a number of third-party vendors for certain labor and materials—*e.g.*, event security, signage, décor, and exhibits. TTG then sent BTC quotes on TTG's own letterhead for these expenses.

12. There was no written agreement between the parties. Instead, as TTG performed work in preparation for the conference, it periodically sent BTC quotes for particular line items, such as security, exhibits, or equipment. BTC paid deposits based on these amounts to be credited towards the final invoice. TTG promised that the quotes it sent to BTC would be based on true and accurate representations of its actual costs.

13. In late January 2022, roughly 3 months before the event, Neeshu Hajra, TTG's VP of Business Development, sent BTC an itemized budget of $15 million to complete the event.

14. BTC was immediately shocked and concerned because it was expecting a budget of $10 million. BTC examined the specific line items in the budget and believed that a number of

items were being significantly over-quoted and there was no transparency as to TTG's markups from its actual costs.

15. When confronted with the over-budgeting and lack of transparency on costs, Hajra blew up and accused BTC of trying to steal all of his relationships with the vendors and subcontractors TTG was using for the conference.

16. At this point, BTC was so concerned with TTG's billing procedures that it was considering terminating TTG and finding a new general service contractor for Bitcoin 2022.

17. On or about January 27, 2022, BTC's CEO, David Bailey, had an in-person meeting in Miami with Hajra to discuss BTC's concerns.

18. Bailey challenged specific line items in TTG's $15 million budget as too expensive and proposed to be billed directly by TTG's vendors and subcontractors so BTC could see the actual costs TTG was claiming.

19. Hajra refused, explaining that TTG's relationships with vendors and subcontractors were secret and those contacts would only work with TTG.

20. Hajra further reassured Bailey that the line items BTC had concerns about were only marked up 10–20% from TTG's actual costs because Hajra had leveraged his personal relationships to get special pricing.

21. Hajra stated that the 10–20% markups represented TTG's profit margin on the project, and that TTG was not billing for its time. He also represented that the 10–20% markup had only been applied to certain line items and not all of them.

22. As it turned out, however, Hajra's representations concerning TTG's markups were untrue.

4

23. In reliance on TTG's representations concerning its markups and TTG's promise that its quotes would be based on true and accurate representations of TTG's actual costs, which terms BTC understood to be essential to the bargain, BTC entered into an oral agreement to continue using TTG as its general service contractor for the Bitcoin 2022 event.

24. BTC has paid TTG roughly $12.4 million for its services to date.

25. After the event, TTG sent BTC a final invoice asking it to pay an additional $5 million beyond what it had already paid.

26. Because TTG represented that any markups would only be 10–20% beyond its actual costs, BTC further scrutinized TTG's charges.

27. The results of BTC's investigation were disturbing. For example, TTG originally quoted BTC a total of $249,732 for slides and swings but TTG's final bill charged BTC a total of $386,701 for these items—a 64% markup.

28. BTC also learned that TTG had marked up its invoices for obtaining necessary permits anywhere from 30% to 172%.

29. Further, BTC discovered that TTG billed BTC for 10 forklift drivers but 28 forklifts without any explanation.

30. BTC also discovered that TTG billed BTC between $500,000–$1 million for equipment, labor, and other costs that were already charged in all-inclusive quotes, resulting in BTC being double-billed for these expenses.

31. TTG's final bill also contains hundreds of thousands of dollars in unspecified labor overages, shipping costs, personal assistants, van rentals, hotel charges, and fees with no explanation whatsoever.

32. BTC's analysis of TTG's quotes in comparison with its final invoice led it to conclude that TTG arbitrarily applied non-standard markups across different budget line items to reach a targeted profit margin of 34% for the entire project. For example, if BTC negotiated down the price on a certain line item, TTG would increase another line item to offset the discount to reach the desired 34% profit margin.

33. Moreover, in September 2022, TTG's Wasim Khawaja, TTG's VP of Finance, told BTC's Director of Finance, Didier Lewis, via phone call that the project was a "quote job"—otherwise known as a "fixed fee" arrangement. In such an arrangement, TTG would be paid a fixed price for the total project regardless of its actual expenses.

34. In the final invoice, however TTG passed on to BTC any overages from what it originally quoted as "actuals"—*i.e.*, actual costs. This effectively held TTG blameless for any out-of-scope or misquoted costs. This showed that TTG's representation that this was a "quote job" was false.

35. These gross overcharges are in breach of the parties' agreement that TTG would not exceed the 10–20% markups TTG had originally described to BTC and which led BTC to agree to continue using TTG as general service contractor for the Bitcoin 2022 conference in Miami. Moreover, these overcharges call into question the legitimacy of all of TTG's invoices to BTC.

36. BTC needs a full accounting of TTG's expenses actually incurred, including invoices, bills, and receipts from third parties so it can determine the legitimacy of past quotes it has already paid as well as the amounts TTG is claiming it is still owed. BTC also needs a full line-item reconciliation between its final invoice from TTG and the vendor invoices to confirm what markups TTG actually made on each.

37. BTC has not yet been able to identify all of the already-paid quotes from TTG that contain misrepresentations. BTC reserves the right to amend its complaint to assert additional claims for fraud and unjust enrichment upon discovery of fraudulent charges BTC paid in reliance on the truthfulness of TTG's quotes.

38. BTC has confronted TTG with these questionable charges, but TTG continues to insist they must be paid.

### COUNT ONE: BREACH OF CONTRACT

39. BTC incorporates paragraphs 6–38 as if fully set forth herein.

40. There was an oral agreement between the parties for BTC to pay TTG for services performed in an amount not to exceed 10–20% markups from TTG's actual costs on certain line items. TTG also promised that its representations of its actual costs to BTC would be true and accurate.

41. BTC has performed its obligations under the contract or has a legal excuse for not performing.

42. TTG has breached the parties' contract by charging BTC in an amount in excess of the 10–20% agreed-upon markups and by submitting quotes and invoices to BTC that were not true and accurate.

43. BTC has been damaged as a result of TTG's breach.

44. BTC requests compensatory damages, attorney's fees, costs, interest, and any other legal or equitable relief the Court deems proper.

### COUNT TWO: FRAUDULENT INDUCEMENT

45. BTC incorporates paragraphs 6–38 as if fully set forth herein.

46. TTG made false statements of material fact to BTC, including that it would only charge BTC for its services at a rate such that TTG's markups from its actual costs would not exceed 10–20%. These statements were intended to be part of the terms of the bargain itself.

47. TTG knew when it made these statements that they were false and that it had no intention of keeping its promises.

48. TTG intended for these representations to induce BTC to continue using TTG's services for the Bitcoin 2022 conference and to pay deposits on its quotes as they were submitted to BTC.

49. BTC reasonably and justifiably relied on TTG's representations in agreeing to continue such services and paying deposits based on TTG's quotes.

50. BTC has been damaged as a result.

51. BTC requests compensatory and punitive damages, costs, interest, and any other legal or equitable relief the Court deems proper.

## COUNT THREE: ACCOUNTING

52. BTC incorporates paragraphs 6–38 as if fully set forth herein.

53. The parties' transaction is complex, involving dozens of itemized invoices for millions of dollars of labor and services that must be closely scrutinized, including by examining the underlying bills, invoices, and receipts from dozens of vendors and subcontractors to determine TTG's actual costs, to ascertain the legitimacy of the charges TTG has billed to BTC.

54. TTG has not provided BTC with a full accounting of all invoices, bills, receipts, or other proof of its actual expenses to enable BTC to determine the legitimacy of TTG's charges.

55. Because it is unable to obtain complete information from TTG, BTC has no adequate remedy at law.

56. BTC thus requests the equitable remedy of a full and complete accounting as necessary to set at rest the difficulties between the parties, adjust their accounts, and do justice between them.

### COUNT FOUR: DECLARATORY JUDGMENT

57. BTC incorporates paragraphs 6–38 as if fully set forth herein.

58. A real, actual, substantial, and justiciable controversy exists between the parties concerning what, if anything, BTC owes TTG pursuant to the parties' agreement and whether TTG has overcharged BTC for services performed.

59. BTC requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring the parties' rights under the contract. In particular, BTC requests a declaration that BTC owes no more money to TTG and that BTC has overpaid TTG for charges that were not validly owed.

### PRAYER FOR RELIEF

WHEREFORE, BTC respectfully requests the legal, equitable, and declaratory relief as set forth in each count above, along with its attorney's fees and any other relief the Court deems appropriate.

Dated: July 26, 2023

        Respectfully submitted,

        /s/ *Diana N. Evans*
        Diana N. Evans (FBN 98945)
        Bradley Arant Boult Cummings LLP
        100 North Tampa St., Suite 2200
        Tampa, FL 33602
        dnevans@bradley.com
        tabennett@bradley.com
        P: (813) 559-5500
        F: (813) 229-5946

        *Attorney for BTC Media, LLC*